## UNITED STATES DISTRICT COURT
## STATE OF NEBRASKA

| | |
|---|---|
| **KAREN POLSELLI, an individual,**<br><br>**Plaintiff,** | **Case No.** |
| **v.** | |
| **CHAD F. WOLF, ACTING SECRETARY OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY**<br><br>**Defendant.** | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## <u>INTRODUCTION</u>

1.     Karen Polselli ("Karen") is a former employee of the United States Citizenship and Immigration Services ("USCIS" or "Government").  The Government unjustifiably forced her out of her position, ostracized her, and intentionally subjected her to increased levels of scrutiny and security.  As a direct result, Karen suffered physical and mental harms due to the Government's treatment.  Through the conduct of Karen's supervisors, she was denied . the right to be from discrimination based on her age, disability, and retaliation.[1]   Consequently , the Government demoted Karen, and ultimately discharge her unjustifiably

---

[1] On December 1, 2020, Karen was advised of and received from the Office for Civil Rights and Civil Liberties of the d Department of Homeland Security the Final Agency decision advising her of her rights under the CSRA  to file a complaint in this Court no later than March 1, 2021. (Exhibit A, is a true and correct copy of the final agency action issued by the Department of Homeland Security in this case.)

**PARTIES, JURISDICTION, AND VENUE**

1.      Plaintiff, Karen Polselli, was a resident of Lincoln, Nebraska when the underlying events occurred.  She was born in 1953 , and is presently 67 years of age. Karen was 64 years old when she initiated her claims of discrimination with the federal agency which employed her.

2.      Defendant, United States Citizenship and Immigration Services ("USCIS") is a federal agency of the United States.   The USCIS may be served with process through its Secretary, Chad Wolf, Washington, D.C. 20420.  Secretary Chad Wolf is the head of the USCIS.

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as the Complaint is based on violations of federal statutes.  Karen filed an EEO complaint on June 5, 2017 alleging age and disability, discrimination, as well as retaliation for complaining about her treatment.

4.      The Department of Homeland Security's Final Decision is dated December 1, 2020 and was received by Karen's legal counsel on or about the same date.  (*See* Exhibit A, *supra*.)  This Complaint is filed within 90 days of Karen's receipt of the Final Agency Decision.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 (c) as the VA is subject to the personal jurisdiction of this Court and because the acts giving rise to the violations alleged occurred in this District, at the VA's Lincoln, Nebraska location.

**BACKGROUND FACTS**

6.      Beginning February 11, 2013, Karen Polselli, then age 60 , started working for the United States federal government as an Immigration Services Officer II

("ISO") at the USCIS Nebraska Service Center in Lincoln, Nebraska.  Securing a position as an ISO II was the achievement of one of Karen's long-held goals.  She was promoted to GS12, Step 2 on May 18, 2014, which was the peak of her career achievements.

### A.   Karen Discloses Her Disability & Requests Accommodations

7.    Karen achieved her employment goals despite her disability.  Karen was diagnosed with and suffers from fibromyalgia.  "Fibromyalgia is a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues[2/]  As early as July 2013 in a series of meetings with her then-Government management team – Nikki Lomax-Larson, Mary O'Callaghan and Brian Lutz – Karen disclosed her disability of fibromyalgia.  She informed these supervisors of her condition, explained she was diagnosed with fibromyalgia, and advised them of the impact it has on her life, specifically informing them of her fatigue issues and , her concentration issues.  .  Although deemed "interactive" meetings, the Government failed to offer (and did not even discuss) accommodations.

8.    Thereafter, Karen requested accommodations.  The USCSI granted her request, in part, and informed her supervisor on May 29, 2015..  Karen was to be allowed to telework, have additional processing time, and work a "maxi-flex" work schedule.

### B.   USCIS' Revolving Door of Supervisors for Karen

2. https://www.mayoclinic.org/diseases-conditions/fibromyalgia/symptoms-causes/syc-20354780.

9.     During the ensuing years, USCIS shuffled Karen from one supervisor to another, both temporary ("T-Pro") and regular, each of whom came with different immigration forms, methods of adjudicating, training methodologies, organizational reference materials, personal availabilities, and communication methods.

| DATE | SUPERVISOR | FORM[3] |
|---|---|---|
| April 2013 – May 2013 | SISO Nikki Lomack-Larsen | I-485 |
| July 2013 | SISO Dawn Vest | I-130; I-485 I-129F |
| Early 2015 | Ron Margadona | Assigned Karen to escort construction employees |
| 2015 | Union advocated Karen's demotion; completed 12/30/2015, which changed Karen's position to ISO I | |
| February 2016 | SISO Jody Fischer, supervised by Senior ISO III Katy Trieweiler. | Combo cards (i.e. I-131 and I-765 denials, renewals |
| April 2016 | Frank Doyle and Crystal Kaster, Senor ISO II | I-765 Form t—was about to be automated |
| October 2016 - February 2017 | Temporary SISO Dale Smith, supervised by T-Pro Section Chief Kathy Allgood. | Employment-based I-131 |
| February 2017 | Temporary SISO Teresa Vuong, SISO Mark Rohrs as section chief | |
| March 2017 | Karen reassigned to SISO Claude Rinke, reporting to Rohrs | New I-131 for Advance Parole" Application for travel documents |
| April 2017 | Rohrs refers Karen to Employee Assistance Program ("EAP") on 04/12/2017 | |
| January 2018 | Mary Beth Brennan Seng determines termination after cancer diagnosis | |

[3] Each form in this chart contains several subtypes of forms, which, in turn, each require specific training. For example, Form I-130, Petition or Alien Relative contains subtypes for Motion and appeals, consulate returns, adoptions, Yemen, and others.

10.    In 2016, Karen briefly worked under supervisor Jody Fischer.  She did well, and Fischer rated Karen as "Meets Expectations."  In fact, Fischer was so impressed with a form checklist Karen created that Fischer advised Karen the form would be used for training future ISO's assigned to work combo cards.

11.    The Government replaced Fischer with Frank Doyle as Karen's supervisor beginning April 11, 2016.  Doyle treated Karen with disdain and contempt.  He supervised Karen, but no others in her position,  by using fear tactic.  Doyle exhibited q caustic and intimidating demeanor which included (1) refusing to answer her questions, and (2) changing her work assignment from Form 765 (employment authorization) "combo cards" (work authorization and travel authorization) to "travel authorization renewal,"[4] and (3) refusing to provide Karen with or allow any training whatsoever for her new responsibilities.  No other USICS employees reporting to Doyle were denied training or suffered from Doyle's silent treatment and refusal to answer questions.

12.    Although Doyle assigned Karen to work on Form  I-76, he failed to inform he that Form r I-765 was a dead end assignment – the form was being discontinued due to automation.  Karen only learned her assignment was being discontinued when she tried to request more files through the electronic file ordering system.  Karen was distressed but  did not confront Doyle because he had refused to help her. Karen worked around Doyle and sought assistance from her former "senior" – Crystal Kaster –

---

[4] The new forms contained critical differences from the travel authorization portion of the combo cards to which  Karen was previously assigned.  The differences were specific as to duration of travel time authorized and the formal final language of record, which were appealable.

5

13.     Doyle retired in October 2016, only six (6) months later, which meant Karen was again re- assigned. She worked next for Dale Smith, another *temporary supervisor* ("T-Pro") who reported to Kathy Allgood, yet another T-Pro.

14.     Smith was aggressive and melodramatic in one of his first meetings with Karen: He launched into a coughing fit, asked Karen if she had a dog, and then shouted at her that he hated dogs and claimed he was allergic to them. Their working relationship did not get better:

   a.  , Smith demanded all team members, including Karen, submit 10 files per week for quality review. However, Smith singled out Karen and wrote her up for her first submission because he did not like how she bundled her files for review, which was precisely the manner Karen had bundled her files and which was uniformly accepted by all her prior supervisors.

   b.  To prevent further problems and turn their relationship around, Karen asked Smith how she could be the kind of employee he needed. Smith's response? He stalked out of his office without answering. Karen could not know if Smith left because he ended their meeting or if he would return and expect Karen to be present.

   c.  Karen checked in with Allgood, who advised her to return to her desk and resume her work.

15.     Karen's assignment to Smith ended approximately four (4) months later, in February 2017. On February 21, 2017, USCIS assigned Teresa Vuong, another T-Pro, to act as Karen's supervisor. Vuong, who reported to T-Pro Allgood, immediately placed a "performance review" in Karen's file, although that review was never officially delivered to Karen. Vuong's review covered the preceding four-month during which

6

Vuong did not supervise Karen, as well as the brief, less than one (1) month period, Vuong supervised Karen.

      a.  Karen only discovered  Vuong's memo and review when she requested a copy of her "unofficial" file.

      b.  Vuong 's review appeared to be a summary of notes from a March 23, 2017 meeting Karen had with Allgood.  Purportedly, Allgood wrote the summary but parts were plainly written , who spoke/wrote English as a second language.

      c.  Karen was shocked and upset when she saw Voong's bombastic summary and so-called  performance review. Vuong had had almost no interaction with Karen and no experience with Karen's work product when the memo was written.

16.    Approximately one (1) month later, in March 2017, USCIS reassigned Karen to yet another new supervisor, Claude Rinke, who reported to Section Chief Mark Rohrs.  Once again, Karen was required to start a new set of forms and  products. Additionally, Karen's assigned produce was different from the forms worked on by all others under  Rinke's supervision.  Thus, not only were the products different than any Karen previously worked on while she was supervised by Doyle, Smith, Rinke and Vuong, no one else on Rinke's team worked the same for assigned to Karen..  As a result, Karen was isolated – she was unable to collaborate with team members while learning her new assignments and isolated from her co-workers. She was often singled out in meetings and told by supervisors that meeting information "did not apply to her." She had limited access to any management representative to whom she could ask questions.

17.     On April 12, 2017, only weeks into the new reporting relationship with

Rinke, Rohrs referred Karen to the Government EAP program, stating in his referral that

Karen was "emotional and agitated" in meetings with supervisory staff.  Karen noted on

the referral form that she "vehemently disagreed" with Rohrs' characterization.  Karen's

fibromyalgia and the years of attacks by her several supervisors, particularly

misrepresentations and falsehoods by Vuong, exacerbated Karen's mental, emotional,

and physical conditions but never resulted in her becoming emotional or agitated with

supervisors.

### C.     Karen's USCIS Supervisors Overreact & Take Illegal and Discriminatory Actions Against Her.

18.     When Rohrs referred Karen to the Government EAP, Karen contacted her

union representatives to follow up on the referral.   She sent her Union representatives

an email stating, in relevant part:

I would like whoever was responsible for that idea to understand that that very thing is just what has the
potential to push me beyond my ability to endure.  If they continue with such antics that have only ruined a
potentially good employee, they may have to address my suicide on the patio outside the front doors of the
Highlands. I am only human and I have been begging for some relief from this incessant harassment – I have
been begging for years.  Now, my dream are ashes, my finances are ruined for life, I am faced with grinding

* * * *

one person in my area that I had the tiniest start of trust for and they sought to undermine that.  Do they
wonder why people go postal?  I'm powerless and they're taking away my ability to provide for myself!  There is
nowhere for me to go, nothing for me on this earth, stop pushing me or my brain matter will be splattered all
across the front of this building – because I DO NOT WANT TO KILL MYSELF but the pain is too much.

(Polselli Email, 4/14/2017, marked as Exhibit A and attached to this Complaint.)

Karen's email expressed her frustration with USCIS management, its inefficient

processes, the failure to train employees, and incorrect assessment processes.

8

19.     When Union representatives received Karen's email, they informed USCIS of its content.

20.     USCIS acted on Karen's email by notifying the Lincoln Police Department ("LPD").  No one from USCIS  bothered to contact Karen and thus could not and did not inquire of Karen whether she was all right or whether she intended to harm herself, if she a plan to harm herself, or if she had the means to harm herself.

21.     That same day, April 15, 2017, Karen was enjoying an  afternoon at home while on leave, playing the piano and playing with her dog.,  At USCIS's direction,  an LPD officer went to Karen's home,  questioned her without permission and against her will, without inquiry as to her mental health or assessment.

22.     Karen was cooperative and accompanied the officer to Bryan hospital.  He put Karen in handcuffs, put her in his cruiser, and delivered her to Bryan East Hospital in his LPD vehicle.  The officer, acting at Rohr's behest, did not inquire of Karen whether she intended to harm herself, if she a plan to harm herself, or if she had the means to harm herself.

23.     At Bryan East, Karen was placed in a small conference/surveillance room, alone.  Male law enforcement and/or mental health staff spoke to Karen in the conference room.   There, LPD advised Karen that the hospital would decide whether she would be detained for three (3) days at the Crisis Center and left Karen alone in the small room.

24.     A hospital employee came and collected biographic data from Karen.  At no time did anyone at Bryan ask Karen if she intended to harm herself, whether she had a plan to harm herself or any attempt to evaluate whether such deprivation of her civil

liberty was warranted.  Shortly thereafter, the LPD officer returned to the conference room and informed Karen she would be transported to the crisis center to be detained.

25.     Karen was quiet and withdrawn, standing in the far corner of the small room.  She took a small step backwards but was already against the conference room wall.  Suddenly, the LPD officer tackled Karen (a petite woman who had no weapon), shoved  her face to the floor, and roughly handcuffed her.  Karen had no thought of and made no move or gesture to suggest that she would not cooperate with the officer.  At the crisis center, officers yanked down Karen's blue jeans and underwear and injected her with Haldol.[5]  These aggressive and invasive actions were taken despite Karen's repeated statements of protest and objection to the injection.  Karen was kept locked up for  observations in the Lancaster County Mental Health Crisis Center for three (3) days.

26.     Immediately after she was released, Karen was expected to and did return to work on Tuesday, April 18, 2017.

27.     When she arrived at work, Rohrs, Karen's section chief, advised her that her  access to the facility was changed.  She no longer was allowed to enter the building alone; she could only enter if escorted by Rohrs.

28.      Karen learned that Rohrs had to escort her to any meeting with USCIS personnel.  Karen was assigned to telework and her access to the building was revoked, except for meetings as described above.  The new requirements forced Karen to deliver  completed files to Rohrs at the USCIS main entrance.

---

[5] Haldol (haloperidol) is an antipsychotic drug that decreases excitement in the brain. Haldol is used to treat psychotic disorders like schizophrenia, to control motor (movement) and verbal (*e.g.,* Tourette's syndrome) tics and is used to treat severe behavior problems in children.  https://medlineplus.gov/druginfo/meds/a682180.html.

29.    Ten days later, despite no intervening events, Don Phillips, Acting Chief of

Staff for the Nebraska Service Center, advised Karen on April 28, 2017, of new and

additional security measures:

> Effective immediately, you will be subject to an enhanced screening procedure when entering the Highland Facility. You and your property must be screened using the x-ray machine and magnetometer each time you enter the facility. Once you are screened, you will be permitted unescorted access to the facility, consistent with current agency-wide access control procedures.
>
> This action is deemed necessary by the Designated Facility Official for your safety while you are in the Federal facility. The enhanced screening procedure will be terminated not earlier than 30 days from the date of this memo and at the discretion of the Designated Facility Official. You must present your USCIS-issued Personal Identify Verification card upon entering and while in the facility at all times.

(Exhibit B, is a true and correct copy of Don Phillips April 28, 2017 memorandum to

Karen Polselli.)

30.    Karen was shocked at this treatment, which was not applied to any other

employee.. She immediately tried to clear the air. She sent a memorandum to USCIS

management, apologizing. Karen apologized "from the bottom of [her] heart for

"unintentionally put[ting] the entire service center into a state of alarm." She

emphatically stated that she did "not now, nor [has she] ever, nor will [she] at any time

in the future have any intention whatsoever of harming [her]self or anyone else."

31.    Nonetheless, on May 31, 2017, Karen's enhanced screening was

continued, remaining in place for months. Karen was not allowed access to the building

through the regular employee entrance except through the guards' station adjacent to

and in full view of the main entrance to the building. She was subjected to enhanced

screening procedures requiring that she and her belongings  be screened using an X-

ray machine and magnetometer. Screeners required Karen to remove shoes, clothing,

and possessions, thus delaying her access.

11

32.     The enhanced security process, standing alone, was a direct blow to Karen's dignity and self-worth, causing her extreme embarrassment, public humiliation, stress, and trauma.

33.     The Government refused to allow her entry to the Government facility on the same basis it allowed all other employees entry.

34.     The Government forced Karen to enter through a separate screening area staffed with building security personnel and equipped with metal detectors, hand-held scanners, and x-ray scanning machines, all of which were adjacent to and in plain view of USCIS employees entering the facility's main entrance.  This enhanced security process continued for three and one-half months, finally ending September 14, 2017.

35.     While these stringent measures were in place,  Rinke added a new requirement on August 10, 2017.  Karen had a weekly one on one meeting with Rohrs to discuss a Performance Improvement Plan ("PIP") imposed on August 1, 2017, in the midst of the enhanced screening procedures.  She asked Rohrs about the process for turning in files daily while she was banned from the building, and he agreed that requirement could be terminated.

36.     Nonetheless, Rinke claims that during this same weekly meeting on Karen's PIP Karen threatened him:

    a.  Actually, Karen told Rinke that **she felt her life was being threatened by USCIS.**  Karen was describing for Rinke a historical, violent home invasion she experienced several years ago that severely traumatized and affected her.

    b.  While describing the historical home invasion to Rinke, Karen explained, "I vowed then no one would ever hurt me like that again."  She described for

12

Rinke how that historical home invasion affected her perception of her

current work situation, stating,

> "I feel like this is a threat to my life, but it is not a home
> invasion, it is not a boogey man jumping out from
> behind a bush.  **It is my office** and **the only
> appropriate weapons are my words**."

37.     USCIS informed the Office of the Inspector General ("OIG") that Karen

threatened Rinke in the August 2017 meeting with Rinke and erroneously reported that

she stated she wanted to kill him    She made no such statement, nor did she hint at

anything remotely suggesting any such act.

38.     Karen's statements to Rinke did not constitute or contain a threat, either

explicit or implied.  Karen stated the opposite -- she stated she did not feel Rinke was

trying to kill her.  She did not express any planned, contemplated, or anticipated,

physical harm to him, herself, or anyone, whatsoever.

39.     Indeed, Karen's  May 4 memorandum eviscerates any such perception.

(*See* ¶ 12, *supra*.)  The Government retaliated against Karen at least twice for stating

her concerns and opinions about the USCIS, its  management of her, its lack of training

on her ever-changing assigned work product, and its assessment of her.

40.     USCIS, including Karen's supervisors, erroneously viewed her statements

as a threat, and sent law enforcement investigators from the Department of Homeland

Security ("DHS"), the Office of the Inspector General, and the Lincoln Police

Department ("LPD"), to Karen's home.

41.     OIG did not advise Karen that she could have a union representative until

the conclusion of the interrogation at her home.  Only then was Karen allowed to have

union representation present when the interrogation continued at the office.

42.     OIG representative Amy Owen threatened Karen.  She was told Karen she could be subject to criminal prosecution for threatening a federal officer, despite a complete lack of factual foundation supporting any such claim.[6]

43.     Specifically, Karen was threatened with criminal prosecution without a factual basis.  T-Pro Supervisor Vuong falsely accused Karen of threatening her by pounding Voong's desk and hurling racial epithets, as well as falsely claiming Karen stalked her into a restroom at work.  None of these incidents occurred.

44.      In addition, OIG officer Amy Owen retaliated against Karen, Owen contacted Karen's sister, a non-USCIS employee and informed her that Karen was making her current employment situation harder on herself because she was pursuing her administrative rights under state and federal discrimination laws.  *See* EEOC Intake Form w/ Attachment.  Owen's  action constitute direct evidence of threats and retaliation against Karen.  Karen was singled out for treatment as if she were a criminal.  USCIS failed to recognize that Karen was simply an employee with a disability exercising her statutory and constitutional rights.

45.     Karen was finally allowed to return to work, but Rinke continued to single her out and  manufacture issues with her performance.

46.     For example, USCIS refused Karen's request that she be assigned to a team working on the same product to which she was assigned.  Instead, Rinke micromanaged Karen, requiring every step of her work product be taken up the chain of command, markedly  increasing the time necessary for her to complete her assigned files.  At the same time, Rinke berated Karen for the slow rate at which she completed

---

6. Indeed, the Government's actions in this confrontation constitute multiple threats made to Karen, who was a federal officer at the time.

her assignments and ignored any occasions when she exceeded performance production standards.

47.    During this time, USCIS did not consider speed of production as the determinative factor in employee evaluation.[7]  Instead, the Government emphasized quality over quantity by utilizing "quality of production" as the primary factor governing employee evaluations.

     a. "Quality of production" was based on a goal of zero errors – not on the number of files an employee could turn around (*i.e.,* the speed) .

     b. USCIS held its employees to both standards, contrary to the "quality" evaluation standard negotiated with AFGE and despite USCIS claims that the performance standard had been changed from quantity to quality.

     c.  Despite the change, employees continued to utilize substantially the same processes to enter their work in the same electronic system.

48.    Significantly, during Karen's "training" periods (as with all  USCIS employees in training), speed of production and quantity are not applicable to employee performance and evaluation.

     a. Despite various awards and remarks by Rinke and other superiors that Karen had done particularly good work on various files, they continued to find reasons to downgrade her performance.

     b. Rinke held Karen to both the discarded "quantity" standard as well as the new "quality" standard, as reflected in her performance evaluations.

### D.    Denial of Telework Accommodation

---

[7] Rather, elements of evaluations were weighted, which is in the evaluation form.

49.    Karen was granted a May 2015 disability accommodation, allowing her to telework.  (*See P*aragraph 4, *supra.*)  T-Pro Section Chief Allgood worked to eliminate that accommodation om 2017, and she succeeded in doing so.

50.    Allgood asked Union President Jay Brown in 2017 how she could prevent an employee from being allowed to telework.

51.    Brown told Allgood that if a supervisor did not "sign off" on an employee's training, the employee would not be allowed to utilize telework privileges while in training.

52.    Karen's trainer, Crystal Kaster, "signed off" on Karen's training. Supervisor Rinke, however, refused to do so.

53.    In 2017, Rinke effectively eliminated  Karen's telework accommodation previously granted by USCIS in 2015.  This termination is direct evidence of the Government's denial of an accommodation for Karen's disability and constitutes a failure to provide accommodations for a known disability, after an accommodation was granted. Karen's condition had not change, nor had she requested or agreed to elimination of the accommodation.

54.    For as long as Rinke denied Karen the telework accommodation, Rinke and USCIS assessed Karen's work product under expired performance standards that simply did not apply to her – Karen was in training, as evidenced by Rinke's refusal to sign off on the completion of her training.  Nevertheless, Rinke held  Karen to both quantity and quality performance evaluation factors.

55.    Rinke finally relented in late October 2017 on his refusal to allow Karen to telework.  He only allowed Karen to utilize USCIS' approved accommodation for her disability after she begged him for telework because she was physically exhausted.

16

### E.   Karen Suffers An Additional Disability Which Complicated Matters Even Further.

56.     During November 2017, Karen was diagnosed with cancer.  Her surgeon scheduled her for surgery for early 2018.

57.     Karen informed USCIS of her cancer through her supervisor Rinke on December 15, 2017 and told him her surgery would be scheduled soon.  She also alerted Rinke and USCIS management to her doctors' stated expectations that she would need one (1) week in the hospital for surgery and another month for recuperation at home before returning to work.

58.     Two hours after Karen informed Rinke and USCIS of the imminent hospitalization, Rinke told Karen for the third time that day that she "does not have a single redeeming quality."  (Polselli Email, 12/15/2016.)

59.     Two weeks later, on December 29, 2017, Rinke again met with Karen to discuss a current PIP.  He refused to tell her the status of her PIP.

60.     On January 4, 2018, Karen confirmed for USCIS management that her surgery was scheduled for January 17, 2018.

61.     One week before the scheduled surgery, on January 10, 2018, Government Acting Chief of Staff Mary Beth Brennan Seng, told Karen she had not successfully completed her PIP.  Brennan Seng told Karen the Government did not know what it planned to do next.  Brennan Seng told Karen she would contact  her with one of two adverse options: demotion or termination .

62.     Having heard nothing before the scheduled surgery , Karen sent Brennan Seng an email reminding Brennan Seng that she needed to make leave requests for

17

surgery that same day, January 16, 2018.  Karen intended to use "advance leave;"

which was dependent on Brennen Seng's  "termination versus  demotion"  decision  .

63.     Brennan Seng denied Kare's request for advance leave.  Karen was

subsequently terminated.

### KAREN'S STATUTORY CLAIMS
### AGAINST DHS & THE GOVERNMENT

**I.      KAREN'S SUPERVISORS DISCRIMINATED AGAINST HER BASED ON
HER DISABILITY THROUGH (1) DISCRIMINATORY TERMS AND
CONDITIONS OF EMPLOYMENT AND (2) FAILING TO PROVIDE HER
WITH REASONABLE ACCOMMODATIONS.**

64.     Karen incorporates by this  reference paragraphs 1-60 , *supra*.

### A.      Disability Discrimination Based on Karen's Terms and
### Conditions of Employment.

65.     To establish a prima facie case of disability discrimination, a plaintiff must

show: (1) that she was disabled, (2) that she was qualified to do the essential job

function with or without reasonable accommodation, and (3) that she suffered an

adverse action due to his disability.   *Hernandez v. Hormel Foods Corp.*, 2018 WL

4265909, at *2 (D. Neb. Sept. 6, 2018).

66.     Karen is disabled.   She was  diagnosed  with  fibromyalgia,  which

substantially limits Karen's major life activities.   Her fibromyalgia caused her fatigue,

affected her emotion al health, and memory thus significantly restricts Karen's ability to

sleep, care for herself, and perform certain manual and emotional tasks.

67.     Karen's disabilities were exacerbated by being singled out and ostracized

at the hands of her supervisors, as set forth in paragraphs  5 through 42, and

paragraphs 5 through-59.

68.     Karen's supervisor's  singled Karen out, treated her differently than other employee that reported to them  refused her training, and isolated her from other employees

**B.     Disability Discrimination Based on USCIS' Failure to Accommodate**

69.     To support a failure to accommodate claim, the plaintiff must establish both a prima facie case of discrimination based on disability\ and a failure to accommodate it.   *Hernandez v. Hormel Foods Corp.*, 2018 WL 4265909, at *2 (D. Neb. Sept. 6, 2018).

70.     In 2017, Karen requested accommodations for her disability.  Karen requested  the ability to "telework," additional processing time, and flexibility in her work schedule.  .  The USCSI granted her request, in part, and informed her supervisor on May 29, 2015..  Karen was to be allowed to telework, have additional processing time, and work a "maxi-flex" work schedule.

71.     Despite no changes in her disability, T-Pro Section Chief Allgood worked to eliminate that accommodation in 2017, and she succeeded in doing so.

72.     Allgood asked Union President Jay Brown in 2017 how to prevent an employee from being allowed to telework.  Allgood's inquiry is direct evidence of USCIS' intent to withdraw Karen's accommodations to which USCIS previously agreed in 2015.

73.     Brown informed Allgood that an employee would not be allowed to utilize a telework privileges while in training. If a supervisor did not "sign off" on that employee's training.

74.     Thereafter, during 2017, Rinke unilaterally eliminated  Karen's telework accommodation previously granted by USCIS in 2015.  This termination is direct

19

evidence of the Government's denial of an accommodation for Karen's disability and constitutes a failure to provide accommodations for a known disability. Karen's condition had not changed nor had she requested or agreed to elimination of the accommodation.

75.     In addition, and contrary to the manner in which other employees had their employment reviewed and assessed,  Rinke and USCIS assessed Karen's work product under expired performance standards  based on quantity (and quality) that simply did not apply to her – Karen was in training, as evidenced by Rinke's refusal to sign off on the completion of her training.

76.     Rinke finally relented in late October 2017 on his refusal to allow Karen to telework.  He only allowed Karen to utilize USCIS' approved accommodation for her disability after she begged him for telework because she was physically exhausted.

## II.     KAREN'S SUPERVISORS RETALIATED AGAINST FOR EXERCISING HER STATUTORY RIGHTS TO BE FREE FROM DISCRIMINATION

77.     The Americans with Disabilities Act ("ADA"), Title VII, and the NFEPA prohibit retaliation:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing.

42 U.S.C. § 12203; *see* 42 U.S.C. § 2000e-3(a); Neb. Rev. Stat. § 48-1114.  Likewise, the ADEA prohibits retaliation, 29 U.S.C. § 633 *et. seq.,* as does Title VII.

78.     To show retaliation, a plaintiff must show he engaged in statutorily protected activity, that he suffered an adverse employment action, and that a causal connection existed between the two events.  Close temporal proximity between protected activity and an adverse employment action raises an inference of causation.

79. *In Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64, (2006), the

United States Supreme Court stated

> A ***threat by the government of an arrest for exercising
> statutorily guaranteed rights is direct evidence of
> retaliation***. *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 984,
> 986 (C.A.10 1996) (finding actionable retaliation involving
> criminal who complained about discrimination).

(Emphasis added.)

80. Here, the Government has engaged in ongoing retaliation against Karen.

First, Karen  made no threat toward Supervisor Rinke when she relayed to him the

events she endured in a prior home invasion.  Nonetheless, by treating her statement of

her history as a threat, the Government retaliated against Karen when it changed her

building access, subjected her to additional searches and seizures, and ultimately

terminated her.  The enforcement of such restrictions by Owen constitutes additional

retaliated against Karen.

81. Second, Karen was threatened with criminal prosecution without a factual

basis.  OIG officer Amy Owen contacted Karen's sister, a non-USCIS employee and

informed her that Karen was making her current employment situation harder on herself

***because she was pursuing her administrative rights under state and federal***

***discrimination laws***.  Owen's statements to Karen's sister constitute direct evidence of

threats and retaliation toward Karen.  The Government singled Karen out to treat her as

if she were a criminal, while failing to recognize that she was simply an employee with a

disability exercising her statutorily protected rights.

### III.   **KAREN'S GOVERNMENTAL SUPERVISORS VIOLATED THE ADEA**

82.     To state a prima facie case for age discrimination under the ADEA, a plaintiff must demonstrate she (1) was at least forty years old; (2) was qualified for the position in question; (3) suffered an adverse employment action; and (4) was rejected for or treated less favorably than someone sufficiently younger to permit the inference of age discrimination.  *Williams v. H & H Auto Parts, LLC*, 2020 WL 490963, at *9 (D. Neb. Jan. 30, 2020).

83.     Karen can meet these elements because she (1) is over  40 years of age; (2) was performing her job satisfactorily; (3) was discharged; and (4) was either replaced by substantially younger employees with equal or inferior qualifications or was discharged under circumstances otherwise giving rise to an inference of age discrimination."    *Coleman v. Quaker Oats* Co., 232 F.3d 1271, 1281 (9th Cir.2000). This inference can be established by "showing the employer had a continuing need for [the employees'] skills and services in that their various duties were still being performed ... or by showing that others not in their protected class were treated more favorably." *Diaz v. Eagle Produce Ltd. P'ship,* 521 F.3d 1201, 1207–08 (citing *Coleman,* 232 F.3d at 1281). Ultimately, the allegations must establish that the plaintiff's age was the "but-for" cause of the adverse decision. *Gross v. FBL Fin. Servs.* 129 S.Ct. 2343, 2351 (2009).

84.     Karen weas older than many of her supervisors and older than her co-workers.  She was held to a higher standard than her younger co-workers, and unjustifiably  expected to achieve employment skills without training that was provided to other  USCIS employees, particularly those younger than Karen.

## V.    <u>CONCLUSION</u>

Karen' requests judgment be entered in her favor, that USCIS be enjoined from violating her statutory and Constitutional rights, and that  she be awarded damages for the following:

1.  Pain and Suffering,

2.  Medical expenses incurred because of emotional stress,

3.  Loss of employment,

4.  Loss of reputation,

5.  Attorney fees, and

6.  Such other and additional relief as the Court deems appropriate.

**PLAINTIFF MAKES DEMAND FOR TRIAL BY JURY.**

DATE:  <u>February 28, 2021</u>.

KAREN POLSELLI Plaintiff,

By:    <u>s/ *Terry A. White*       </u>
Terry A. White, NE # 18282
CARLSON & BURNETT LLP
2002 Douglas Street. Suite 100
Omaha, NE 68102
Direct (402) 682-8006
Main (402) 934-5500
terry@carlsonburnett.com
*Attorney for Plaintiff*

23